Good morning. May it please the Court, my name is Marjorie Bronster, and I represent Carolyn Ritchie. I would like to reserve five minutes. This appeal centers upon two primary issues. One is the question of whether or not Carolyn Ritchie was a public employee or whether she was acting as a private citizen when she complained about the program that Warden Wagatsuma created and ran. We submit that the jury should have been allowed to decide that issue. We do not believe that the Court should have, pre-trial, decided that this issue was an issue to be decided by the judge, and by doing so, by deciding that she was in fact acting as ... It wasn't during trial, was it? It wasn't during trial, I apologize. In essence, what she did was she took away from the jury the right to look at the comments that Carolyn Ritchie made within the prison system. The primary argument that the defendants make is that it is because she admitted that she was a mandatory reporter that she ... What exactly is a mandatory reporter? Do we know? Is it in the record? The only thing that's in the record about what is a mandatory reporter is what Carolyn Ritchie said. She said that because she was trained as a psychiatric social worker, she felt that she had some ethical obligation to protect those who were vulnerable in society. She felt that it was those ethics that required her to report what she believed to be civil rights abuses of female inmates in the prison. I was looking for it and I was having a hard time finding it. It appears on two pages, Your Honor. The first one is ER 2438, where she said, because my profession and code of ethics, I'm a mandated reporter, I don't have a choice. I have to report abuse and neglect, especially of vulnerable populations. Later, she said that she reported because she believed that showing the rape videos to the female inmates, I believe they violated standards of decency and ethics of professionalism and they were damaging and hurting the inmates. That appeared on ER 2443. It is the defendant's position that that is the only evidence that goes to the issue of whether she was acting as a private citizen or as a public employee. Now, is there a statute in Hawaii that says who is required by law to report allegations of, typically a mandatory reporter versus sexual abuse or something like that? There is, Your Honor, but that was not the issue before the court below. What Carolyn Ritchie believed that she had to report was the systemic abuse of women and not a specific issue of child abuse, which would have been subject to the statute. Report to whom? Who did she feel obligated to report to? Well, she felt obligated to report to basically anyone who would listen. She reported to her boss. She reported to the Attorney General's Office. She reported to the EEOC and the Hawaii Disability Rights Commission. So... What? And to the ACLU? And the ACLU. But for some reason, aside from this problem, the... but I don't think you've argued about this. The jury was told that only the EEOC and the Disability Rights Project mattered. Not the Attorney General and not the ACLU. Yes. Aside from not her... but you haven't really argued about that. No, Your Honor. We believe that her primary arguments about the fact that this entire program was both a violation of civil rights and... I know, but with regard to whether she was acting as a public employee, I mean, is the defendant's position that complaining to the Attorney General is part of her employment? Your Honor, yes. Your Honor, they believe that only the ones outside were okay. I see. We had a situation because some of the reports were at different times in the process. So having the opportunity to look at this did have an impact and was prejudicial to Carolyn Ritchie's position. But we believe that even the state admits that normally these issues should have gone to the jury. And they take the position that only when there can be no other outcome is it appropriate for the court to rule. In this case, there were so many indicia that this was not her job. She was not in internal investigations. She was simply dealing as a part-time social worker. She was told not to do this. She was told to stay away from the warden. She was told that this was going to circle back at her. All of those things should have been things that the jury should have been able to... Well, she did report to her immediate supervisor. Correct. Or reported to his supervisor, who then basically jumped the line and went over to the other division. Right. Right. But her reporting was, in fact, up the line of her supervision. It started out that way, yes, Your Honor. Yes. And that's... I wanted to make a bet. Well, I think once... That is not dispositive. I think the fact that she went up the... You have to take a look at whether or not the subject matter of what she was reporting was the type of subject matter that was her job to report. Well, in her direct examination, she said, I told him that I was counseling and a female inmate who I considered to be mentally ill, who needed me to intervene. She was humiliated to the point of being hysterical. So it seems that she considered that to be part of her job to intervene on behalf of the inmates who were complaining to her. Your Honor, that is one example where it did relate to a specific inmate, but the vast majority of her complaints about the pornography that was being... That she believed was being shown within the prison, about the shaming that was ongoing, a lot of those were things that she had heard from others that were part of this entire program, not necessarily patients or inmates who were... She was charged to report. But wasn't that part of her responsibility, her assumed responsibility for the health of the inmates? Well, when you look at the specific job description, that is not something that she's supposed to be doing. And in fact... So of course the job description is not always determinative. Understood, Your Honor. And I would submit that it was rather the entirety of the situation that has to be looked at, not just one fact or another. And so the fact that she started to do this by going up the chain was something that was not part of her job. She was not in internal affairs, for example. There were no forms that she was filling out to talk about how the correction officers were treating the inmates. Instead, it was something where she was told specifically, this is not within your structure. That's what Dr. Mitchell said. Let me ask you something. I know that this whole issue of public employee versus private actor is a very factually intensive kind of examination, but our cases are replete with the courts making that judgment as a matter of law, as opposed to sending it to the jury. Your Honor, I would submit that once the Ninth Circuit decided the Posey case, it was clear that this is something that is a question of fact that should not be decided on... When did we decide Posey? Was that after Dahlia? Yes, it was. It was in 2006. And I believe that once the Posey case was decided, it became clear that it was a mixed question of law and fact that should go to the jury. What do you do? Do you have the jury decide the facts related to that, and then the judge sort of applies the law at that point? Well, I think that what the jury should be asked is whether or not she was acting as a public employee or whether she was acting as a private person, and that would determine whether or not her statements would be subject to protected rights. She can be doing both and still have her statements protected. That's the Dahlia case. That's correct. You're lining up the chain of command and you go on out. That's correct. And the concept that there was only one outcome is belied by the fact that pretrial, in dealing with a summary judgment, the court specifically said that it is clear that the plaintiff spoke as a private citizen. And then later, obviously, she came out a different way. I think that in and of itself suggests that there were two ways in which she could have come out. The second set of issues for this court are the cumulative effect of a number of evidentiary rulings that we believe to have been erroneous. On the one hand, Carolyn Ritchie was prevented from putting in very substantial amounts of evidence, evidence of the video itself, evidence of an expert who would have testified that there was no therapeutic value to the program and that, in fact, it was dangerous to the inmates. The jury found that her concerns were reasonable, so what difference would it have made? That was not the only area in which this would have been relevant to. There were a number of different causes of action, and one of the issues was qualified immunity. Whether or not Warden Wagatsuma was reasonable in believing that he had done nothing wrong. That depends on law, not on what the expert thinks is good psychology. Well, I think the question is, we were trying to present to the jury how inappropriate this was. This was not a question of the fact that Ms. Ritchie didn't like the warden's... They bought it. They bought it, as I understand it. At least they bought that she was reasonable in thinking it. Well, they bought it because she was reasonable, but they also bought that he was reasonable, which is why they let him off on qualified immunity. But it's a different reasonable, right? First of all, I think it's very odd that qualified immunity is going to a jury. I understand we have some case saying that. Usually it doesn't, and it seems very peculiar. But aside from that, it's about what he would have thought his legal obligations were, not what he would have thought his professional obligations were. Qualified immunity, right? Well, the question is whether he believed that he was being reasonable in how he was treating... But it's a different reasonable. It's not reasonable like a reasonable person. It's reasonable in his understanding of his legal obligations. Understood, Your Honor. And if... Which is why it's odd for it to go to a jury. Well, but it was going to the jury, and we believe that the jury should have been able to have a more complete view of what was actually being presented, which they were denied. But on the flip side, the jury was given incredible amounts of hearsay, which should never have gone to the jury. The first and second investigations were filled with hearsay and double hearsay, which were allowed to go, and we believe improperly so. Counsel, were you going to address the cost issue? Pardon? Were you going to address the cost issue? I was hoping to be able to reserve some time, but yes, I'd be happy to, Your Honor. I have a supervening question. The jury found, as I understand it, with regard to both the First Amendment issue and the Title VII issue, that she didn't prove by her ponderance of the evidence that she suffered adverse employment actions. Now, I don't understand how they could have done that, because they were told that a suspension and a mandated leave was an adverse employment action. But they did, and you haven't challenged that. So why isn't that knock both causes of action on them? Why haven't they just gone? Well, Your Honor, we believe that because of the evidentiary problems, she was prejudiced, and that is what led the jury to . . . Why is she prejudiced with regard to whether she suffered adverse employment actions? That's a diverse question. That's a separate question. Well, Your Honor, we believe that because of these issues and the questions that did come before the jury, the investigations that suggested all sorts of nefarious actions on her part, which were improperly . . . You're just suggesting prejudice with regard to that . . . Yes. . . . that finding about something completely else? Yes, Your Honor. We believe that it tainted the entire proceeding. But you didn't even challenge those findings on that ground. You didn't challenge them on any ground. Well, Your Honor, as I said, we did challenge the fact that the cumulative problems with the evidentiary rulings tainted the entirety of the proceeding, including that one. Counsel, could you address my question about cost, please? Yes, certainly. The question that the Court had to address, I believe, or that the Court should have addressed, was the question as to whether or not it would have a chilling effect to charge someone like Carolyn Ritchie with costs. We believe that because of the public interest, and I think that the evidence that we were attempting to submit also went to the scope of the public interest, all of those issues should have led the Court to believe that she should not have been subject to paying the costs of the State. Is it true that she was seventy-five years old? Yes, Your Honor. Thank you. If I may reserve . . . Thank you. You're out of your time. Let's see if you need rebuttal after you hear from the opposing counsel. Good morning, Your Honors. May it please the Court? My name is Robert Nakatsugi, and I am a Deputy Solicitor General for the State of Hawaii. I represent the Department of Public Safety in Neal Makatsuma. Your Honor, I'd like to answer, first of all, the specific question that Your Honors asked about the reports outside the agency. Yes, she did make some reports to other agencies, such as the Attorney General's Office, to the ACLU. The Court excluded those reports, and it was because there was no evidence that Mr. Wakatsuma was aware of those reports, and so there was no connection to retaliation. He didn't know she had reported them. He couldn't retaliate. So that's why the claims . . . I thought the Attorney General was, in fact, asking questions. I'm sorry? I thought that there was somebody appointed by the Attorney General to look into this. There was somebody who was called as a witness, but it turned out that there was no evidence that Mr. Wakatsuma was aware that she had been contacted, and so because of that, her testimony was irrelevant. And also, the allegations about her reports to these other agencies, the Court excluded because there was just no causal connection between the retaliation and the reports. Now, in addition, Your Honor, I'd also like to answer a few of the other questions that came up regarding whether the scope of someone's professional duties, whether that's a fact question or not. Your Honor, Judge Wardlaw, you are correct that there is abundant case law where these matters are decided as a matter of law. The Posey case, that came out in, I believe, 2008, but there are other cases since then. The Dahlia case is actually a 2013 case, and Dahlia actually relies on FriTag. Although FriTag was 2006, Dahlia relies heavily on FriTag, so I think Dahlia is still good law. And what both FriTag and Dahlia indicate is that when there's only one reasonable conclusion, you can still decide these matters as a matter of law. In fact, in FriTag, the question apparently went to the jury, and it was found to be error. So I think Judge Kobayashi here, she was in a tough spot. If she didn't make the decision based on Rule 50, then she could have been reversed. So, Your Honor . . . Why would she be reversed? Your Honor, because I think if the question had gone to the jury and there was only one reasonable conclusion, I think that might have been reversible error. I mean, the reversal would be for lack of substantial evidence, but I never understand why district judges do this instead of just letting it go to a jury. Well, Your Honor, in any event, the case law does seem to indicate that not only can you decide this as a matter of law, but perhaps you should. You might get in trouble if you don't. Now, Your Honor, on the question of . . . The jury at first isn't getting into trouble. I'm sorry, Your Honor. Happens to everyone. Your Honor, as for some other statements that Ms. Bronster mentioned, she argues that, first of all, the admission . . . I, Your Honor, would point out that Ms. Ritchie, she says that she's a mandated reporter. She testifies that she feels she has to report . . . But, again, let me go back to what that means. When they say mandated reporter, was there a rule within the prison system that she was in a position where she was required to report? Was there a statute that required her to report? I don't think it's that specific, Your Honor. I think it's just a common expression among health care and social service people where you're supposed to report abuse and neglect. But it's such an important issue in this case. I really don't understand what it's supposed to . . . Was she really supposed to report things or required by anything? Your Honor, her testimony is that she was. That's the other . . . You know, but . . . There are statutes that require certain people in certain circumstances to report certain things. Usually, it has to do with children or disabled people, and they're quite specific and they're not generic. More than that, they deal with the person's professional responsibilities, not their job duties. Now, does that distinction not matter or does it matter? Your Honor, I think it doesn't matter in this particular case, because her understanding was that she had to report abuse and neglect. It was part of her professional ethics, and . . . Right. Not part of her job. Not part of the job requirements, but part of her licensing status. I would argue it was part of her job. Her own testimony established that. Was there any job requirement that established that? Your Honor, I don't believe it's any formal job description, but under Garcetti, that's not required. What's required is a practical inquiry as to what her professional duties actually are, and she provided that. She provided the evidence of what her professional duties were. I'd like to point out excerpts of Record 2395. That's the transcript of November 23rd, page 91. She says it's a part of her work to comply with her professional ethics. She's the one who drew the connection there. She's the one who said that this is part of her professional duties. Now, separate and apart from her admission there, there are other factors that further indicate that she was acting pursuant to official duty. In Dahlia, there's a bunch of factors that the Court mentions, and in Dahlia, one of them was whether the complaints were made to . . . within the chain of command, and she did make complaints to her immediate supervisor. That's undisputed. Another factor was the subject matter of the complaints. She testified that she had responsibilities to all of the inmates, not just the ones outside the LTS program, but to all of the inmates. She also testified extensively about how she thought the LTS program was hurting the inmates. So, the subject matter of her complaints related to her job. It was not broad, systemic corruption or abuse. This was related to her job. Providing counseling, as I understood it. I believe she was supposed to be treating them for mental health issues, I think probably especially possible suicide, but she testified that she was responsible to these inmates, and so if there was a potential harm to their mental health, it's related to her job. It's not related to broad, systemic corruption or abuse. A third factor was whether she acted in direct contravention of her supervisor's orders. Now, Ms. Bronster said that she was told to stay away from, in her brief actually says stay away from LTS. That's not actually what the record says. In fact, what the testimony was from Dr. Mitchell was that she was told to stay away from Wakatsuma. I think he was worried that there might be a physical confrontation between them, and he told her to stay away from Wakatsuma. He did not tell her to stay away.  I can only speculate on it, Your Honor, but what Dr. Mitchell told her was to stay away, not from LTS. He did not tell her to not make the complaints. He did not obstruct her. He did not harass her. He actually helped her make her complaints. He asked her to put the complaints in writing, and he passed them up the chain of command. So, this factor, very clearly, it's in our favor. Dr. Mitchell did not obstruct her. He helped her. All of these factors. I ask Ms. Bronster, I understand that the jury found, with regard to both the First Amendment and the Title VII issue, that there was no adverse employment action. Yes, Your Honor. At some point, you argue that that means anything else that happened is harmless, essentially. I don't understand how there was no adverse employment action, since the jury was specifically told that the investigation and the suspension were adverse employment actions, but somehow they found there wasn't. Is that the end of the case? Well, Your Honor, they haven't raised the adverse employment action issue. I know they haven't, and I'm asking you, if there was no adverse employment action on either of these, with regard to either of these matters, even if there was retaliation. Now, I suppose the difference, maybe, is that she's still entitled to try and put on a case about whether, about her, the complaints that were within her line of authority, but if there was no adverse employment action, then there was no adverse employment action. Yes, Your Honor. The jury found no adverse employment action. That should be the end of that count. Well, every count. Well, yes, and plus the other decisions in the special verdict forms, which found other elements to be not proven. So, I would argue, Your Honor, that... What other elements? Well, in the 1983 claim, the jury found no retaliation. Yes, but that clearly could be different, if the claim were broader. Your Honor, I will address the other part of the 1983 claim, if I'm able to, but the other claims, they were decided on other grounds. There was, for the intentional infliction of emotional distress claim, there was no outrageousness. For the state retaliation claim, there was no incitement. So, if you look at the special verdict forms, all of the claims were disposed of on other grounds, and their evidentiary arguments really would not have affected the outcome of the case. Well, with regard to the Lindsay and, what's the other guy's name? Vittorio? Vittorio. Vittorio. Reports, that seems really difficult, because they were, you know, very specific and very damning, and they came... Lindsay seems to have come to the conclusion that she really did tell people to tape the warden, and so there were his conclusions and so on, and it seems to me to make a huge difference whether those came in or not, no? Your Honor, I respectfully disagree. The report authors were allowed to testify themselves, and so the reports themselves... Every detail that was in the report? Well, Your Honor, I would argue that the reports themselves, they were just duplicative of the report authors' testimony, and they were subject to extensive cross-examination. Your Honor, and furthermore, in regard to... Because these reports were instigated by the warden, and he apparently had final review of them, so how can they be unbiased reports? Your Honor, I do not believe he had final review of them. That's my understanding. I thought that's what they said. I believe that he requested them, but he actually requested that Internal Affairs conduct both of them. I know he first did, but that didn't happen, so then he chose who was going to do it, and he had them, and he gave them the parameters, essentially, the information, and they did go back to him. They ended up with him. Actually, the testimony was that Captain Lindsay assigned the investigators. If you look at Captain Lindsay's testimony... But he assigned Captain Lindsay. Captain Lindsay was the Chief of Security, so it's his job to supervise and to assign investigations. And Wagatsuma, he had no role in the assignment or the conduct of the investigations. I believe that if you look at Captain Lindsay's testimony, if you look at Lieutenant Victorino's testimony, and Lieutenant Lindsay's testimony, they all are consistent in that Wagatsuma did not have any interference in the investigations. He did not supervise them. It was Captain Lindsay who was the supervisor of the investigations. Furthermore, when the investigations were completed, they went up to the supervisor of the Institutions Division, Michael Hoffman. Michael Hoffman, he concluded that these were objective and these were fair investigations. So I would argue, Your Honor, there's abundant evidence in there indicating that these investigations were fair. And even if you decide that they weren't fair and that the report should have been excluded, it's harmless error. Now, in regard to the 1983 claims, Your Honor, plaintiff is arguing that just because some reports were made outside of the agency, that means that all of the reports are suddenly protected speech, even the reports that are within the agency. And that's just not a correct analysis of the law. The Dahlia case makes it clear that you look at each report on its own merits. And in Dahlia, in fact, some of the reports were found to be pursuant to official duty, the reports to the supervising lieutenant. But other reports, such as the reports to the police union, were found to be protected. And so the approach, I think, has to be the same as Dahlia, and that's the approach the You look at each report on its own merits. Just because you make one report outside the agency doesn't mean they're all suddenly validated. And I think that's a misinterpretation of Dahlia that the plaintiffs are making. You rely also on a qualified immunity conclusion. How was the jury supposed to decide that? Did anybody give them legal instruction as to what the case law was? I believe they were instructed, Your Honor. I understand it's a bit confusing, but that apparently is the case law, that material facts have to be filed by the jury, even on a qualified immunity issue. And the jury did find no retaliation. Counsel, as to the costs, is it your position that there was no public benefit to the actions taken by Ms. Ritchie? Your Honor, I believe it depends on how you interpret this case. Is this case just a disgruntled worker, or is this case something that implicates important, you know, corruption or abuse issues? What's your position? My position is that I agree with the jury, that this was a retaliation. This is simply an employment case, and the jury found no retaliation. But that's not the issue that we have to address in terms of costs. Yes, Your Honor. I realize that, but I would argue that because the jury decided that this really wasn't a significant and important case along those lines. How did the jury decide that? They didn't decide that at all. They just wrote in favor of, I guess, Wakasugi against Ritchie. They didn't decide this wasn't important. In fact, didn't the practices stop after all this came to light? Well, Your Honor, the actual practices of the LTS program are not at issue in this case. Yes or no? Didn't they stop that program after it was investigated? And didn't they stop showing pornographic movies to inmates? Your Honor, I'm not sure about that. Again, I've been focusing on the retaliation case and what happened after the retaliation case. I'm not sure. Well, Counsel, would you agree that prison reform and prison practices generally is an area that the public is interested in? Yes, Your Honor, but again, this is a retaliation case. There are other cases that address that kind of thing. In fact, I believe that the claims against the LTS program are being addressed in a separate case in district court, but that's not this case. But it stemmed from a complaint about the practices in the prison. The retaliation case stemmed from that. So why isn't that a matter of public concern? Again, Your Honor, I would argue that this case itself is a retaliation case and the jury decided that it was simply an employment case. All right. You've said that three times, and you're over your time anyway. So thank you very much, Counsel. Thank you, Your Honor. Yes, you can have a minute, Counsel. I would just like to return back to the question that Judge Berzon asked earlier, and that is about the finding of no adverse employment act. It really bothers me. Anyway, go ahead. I believe that the reason that they found it is because they believed that there was an adverse job action, and there was retaliation based on the reports up the chain that Wagatsuma admits he knew about. But the adverse employment action, you see, the adverse employment action finding, I need to check this, but I don't think it was a causation requirement. It was simply was there an adverse employment action. The causation was a different question. So how, let me see. Maybe with regard to the Wagatsuma, there wasn't such a finding. I have to go check that out. But in other words, yes, that would be true if the problem was whether they thought that it was caused, that there was an adverse action, but caused, what the cause of it was. And I believe, Your Honor, that that was the confusion that was a result of them being told that they couldn't look at the complaints up to Mitchell that Wagatsuma realized had been hers, and then he took the action that led to her being suspended. And so we believe that that did color their decision in that regard. I would also suggest that the Dahlia case says that if a public employee raises within the department broad concerns about corruption or systemic abuse, it could hardly be viewed as part of her job, and that's precisely what we believe, Carolyn, that she did here. Thank you. All right. Thank you, Counsel. Ritchie v. Hawaii Department of Public Safety is submitted, and this session of the Court will be adjourned for today. Thank you very much, Counsel.
judges: Wardlaw, Berzon, Rawlinson